**TEXAS POWER & LIGHT COMPANY,**
Appellant,

v.

Mack ADAMS et al., Appellees.

No. 207.

Court of Civil Appeals of Texas.

Tyler.

June 16, 1966.

Damon D. Douglas, Athens, John L. Estes, Burford, Ryburn & Ford, Dallas, for appellant.

Robert Fields, Fields, Fields & Hardee, Athens, for appellees.

DUNAGAN, Chief Justice.

This is a condemnation case through which Texas Power & Light Company seeks to acquire an easement from the defendants for the construction of an electric transmission line. The defendants' tract of land consists of 1359 acres and the easement traverses across the property 170 feet in width, containing 38.445 acres.

The parties stipulated that all of the jurisdictional requirements had been satisfied and trial was to the jury on the sole question of land values. The jury found the 38.445 acres within the easement sustained a reduction in value of $5,958.97 ($7,304.55 being the value before the easement was imposed and $1,345.58 being the value after the easement was imposed on a 38.445 acres). The jury also found the 1321.25 acres remaining to have sustained a reduction in value in the amount of $26,420.00 ($250,990.00 being the value of the remainder before and $224,570.00 being the value of the remainder after the easement was imposed).

The trial court accordingly rendered judgment on the jury verdict from which the plaintiff prosecutes this appeal. The parties will be referred to in this opinion as they were denominated in the trial court.

The plaintiff presents 14 Points of Error arranged in various groups, which grouping will be followed, in general, by this court. The first four Points of Error relate to the testimony of Mack Adams, T. N. Winn and Joe Browning, witnesses for the defendants, which read as follows:

"The trial court erred in admitting into evidence the consideration brought by the sale of Loosier to Syler.

"The trial court erred in admitting into evidence the consideration brought by the sale of Grimes to Holt.

"The trial court erred in admitting into evidence the consideration brought by the sale of Compton to Tyner.

"The trial court erred in failing to strike the evidence of the consideration brought by 'a small tract across the road for $400.' "

Under these points, the plaintiff in its brief makes the following complaints of the court action in admitting certain testimony of the three witnesses named above.

"1. Mack Adams, one of the defendants, testified to a sale of 'the small tract just across the road from this subject tract in question that sold for $400.00 an acre.' No other data was elicited concerning this sale such as the grantor, grantee, date of sale, location, size, etc; in short, no attempt was made to show its comparability to the subject property and thus lay a predicate for its admissibility." To this testimony, the plaintiff made the following objection:

"If Your Honor please, we move to strike the testimony of the witness as to what another piece of land sold for because it has not been shown to be comparable to the subject property. And furthermore for the reason that it's not responsive to any question asked of the witness."

Which objection the court overruled.

"2. Mack Adams was also permitted to testify about the Loosier to Syler sale and the consideration it brought of $210 per acre. On voir dire examination of the witness, prior to the admission of the sale price, the witness admitted he was not a party to the sale and his only knowledge was obtained from the deed records and a conversation with the buyer."

To which testimony the plaintiff made the following objection:

"If Your Honor please, we object to the question as to the consideration of this sale for the reason that the witness is not shown to have personal knowledge and it would, therefore, be hearsay as to this Plaintiff and would deprive the Plaintiff of his right of cross examination. And we further object to the admission of the consideration of this sale for the reason that the witness has not shown to be in the real estate business as a business or profession."

This objection was overruled by the court.

"T. N. Winn, another witness called by the Defendants, was also permitted to testify as to the consideration of this sale although he also stated on voir dire examination that he was not a party to the sale and his only knowledge of the consideration was obtained from the deed records and a conversation with the buyer. This testimony was offered and received into evidence for the jury to consider as direct evidence and without limitation, over the objection that each witness acquired his information by hearsay and therefore the Plaintiff was denied its right of cross examination."

The record reflects that the plaintiff made the following objection to such complained of testimony:

"If Your Honor please, the objection to the question inquiring into a consideration that the sale of Loosier to Syler brought for the reason that the witness's sole knowledge is hearsay and would deprive this Plaintiff of the right of cross examination, and further for the reason that it is not shown to be comparable as a matter of law."

The objection was overruled by the court.

"3. Joe Browning, another of Defendants' witnesses, was permitted to testify to the consideration brought by another sale: Grimes to Holt for $240.00 per acre. Again, the witness testified on voir dire examination that he had not been a party to this sale and had no personal knowledge other than that which was obtained from his conversations with the seller. The same objection as before was made and the court admitted the hearsay evidence from this witness for all purposes, without any limitation."

The record shows the following objection by plaintiff to this testimony:

"If Your Honor please, we object to the testimony by this witness of the consideration brought by that sale for the reason that it is based on hearsay and would deprive the Plaintiff of his right of cross examination; in other words, if Your Honor please, the sole knowledge of this witness is hearsay from what he has determined from this conversation with another purpose.

"*   *   *

"MR. FIELDS: Your Honor, we withdraw the question at this time."

"4. T. N. Winn was also allowed to testify to another sale, Compton to Tyner which brought $306.00 per acre. As before, Mr. Winn had no personal knowledge of the consideration which this sale brought other then that which he obtained by hearsay—a conversation with the purchaser and from the deed records. Another objection was made to the testimony as to the consideration of this sale because it was hearsay, same being overruled and the evidence being admitted for all purposes for the jury to consider as direct evidence that the sale. occurred at that price and as direct evidence on the value of the defendants property, all without any limitation."

The following objection was lodged by the plaintiff to the complained of testimony:

"And, if Your Honor please, we object to the admission of the sales price of the Compton to Tyner sale for the reason that the witness's knowledge is solely based on hearsay and would deprive of course the Plaintiff of his right of cross examination. And further, for the reason that it's not shown to be comparable in location, size; it is located some distance from Mr. Adams' tract of land, fifteen miles, I believe, according to this witness's testimony, and we further object then for the reason that it's not comparable as a matter of law."

The objection was overruled by the court.

To support its contentions, the plaintiff relies principally on State v. Oakley, 163 Tex. 463, 356 S.W.2d 909, 95 A.L.R.2d 1207, 1962, and State v. Baker Bros. Nursery, 366 S.W.2d 212 (S.Ct.) 1963, wherein the court restated and reiterated its holding in the Oakley case.

To ascertain the primary basis for plaintiff's contention, we quote from its brief the following:

"The trial court in the Oakley case had instructed the jury and limited the purpose which the jury could consider such evidence: not as evidence of what the properties sold for or the value of the subject property, but only as being information gathered by the witness in

forming his opinion of the value of the subject property.

"Here, nowhere did the Defendants qualify their tender of evidence of the sale price of the other tracts and the trial court placed no limitation upon the reception of this evidence, but admitted it to be considered by the jury as direct, primary evidence of the price each brought and of the value of the subject property."

In our opinion, the decision of the question here presented is governed by the case of Dyer v. State of Texas, 388 S.W. 2d 226 (Tex.Civ.App.) 1965, n. w. h. As we deem this case to be controlling of the question before us, we therefore quote therefrom at length. In the Dyer case the complaint was made against the testimony by two of the state's witnesses, alleging error in allowing the witnesses to testify on direct examination to the mental processes by which each witness arrived at his opinion or conclusion of the value of the property, when no limitation or purpose for which such testimony was offered; that such testimony involved the examination of deed records and revenue stamps and statements of third persons, all of which was hearsay, and also involved remote sales of improved property as compared to the unimproved property in this cause, all without *limitation* as to purpose. The court in passing upon this complaint said:

"A review of the record fails to reveal that any objection was made to the admission of the indicated testimony unless limited to the purpose for which it was admitted. The objections to the testimony seem to be confined to the fact that it involved hearsay or as to remoteness of comparable sales, together with the complaint that the witnesses were allowed on direct examination to reveal the details or mental processes by which each witness arrived at his conclusion as to the value of the land at issue. This last objection seems to be

based upon certain language in the Supreme Court decision in City of Austin v. Cannizzo, 153 Tex. 324, 267 S.W.2d 808, 816: '* * * but inquiry into the details or mental processes by which the witness arrives at his conclusion is only proper on cross examination for the purpose of testing the credibility of the witness or for laying a predicate for impeachment.' This language in the Cannizzo case is, however, modified in the later Supreme Court decision in State v. Oakley, 163 Tex. 463, 356 S.W.2d 909, where, at page 914 [95 A.L.R.2d 1207], it is stated:

'In a sense, of course, testimony of an expert witness concerning comparable sales which he has considered in reaching his opinion touching the value of the property under consideration involves an inquiry into the mental processes of the witness; the real question, however, is whether such testimony, which is inadmissible to prove the facts of such sales as evidence of the value of the property condemned, is likewise inadmissible in another capacity, that is, to show a basis of the opinion value stated by the expert witness and in which capacity the testimony is not hearsay in the true sense. The better reasoned view, in our opinion, is that the testimony is proper in such latter capacity, where, as in the case at bar, the testimony is given by a professionally qualified appraiser whose qualifications, and the comparability of the sales to which he testified, are not challenged. The discretion of the trial judge, particularly in these latter respects, together with the opportunity on cross-examination to bring out facts contradictory to the statements and conclusions of the expert, and the instruction of the court limiting consideration by the jury of the testimony beyond the purposes for which it was admitted, are substantial safeguards against its misuse. Moreover, whatever facilitation of expert testimony

in a condemnation proceeding there may be under our holding is available alike to the condemnor and condemnee.'

"The same holding is found in a still later Supreme Court case: State v. Baker Bros. Nursery, * * * 366 S.W.2d 212, where such testimony was offered for the 'limited purpose of showing what the appraiser considered in arriving at his opinion of the value' and not as direct original evidence of the facts stated therein, and the court admitted such testimony for this limited purpose. See also the 1964 Civil Appeals case of State v. Rumery, 381 S.W.2d 87 (ref., n. r. e.), in which the court states, at pages 89 and 90:

'In the search for market value the information an appraiser might gain from sales here shown is worthy of note, though the tracts are dissimilar in very important respects. These are safeguards against these sales being accorded weight by the jury other than as a factor considered by the appraiser in arriving at his value conclusion. The court's instruction limiting the purpose for which the evidence is admitted and cross examination that emphasizes the negative aspects of comparability are the protective shields of the party resisting the impact of the appraisers' testimony.' * * *

"While we feel that on the basis of the above authorities the complained-of testimony of the two witnesses, Lomax and Rash * * * was probably not admissible without a limiting instruction by the court, if such limiting instruction had been requested, we fail to find in the record any request that the testimony be so limited to the purpose for which such testimony was admitted. (Citing cases) * * * 'Had there been a request on the part of the defendant to limit the purpose for which the testimony might be considered it unquestionably would have been so limited by

the trial court, but no such request was made', * * *."

On the basis of the above authorities, we likewise feel that in the case at bar, the complained-of testimony of the three witnesses, Adams, Winn and Browning, was probably not admissible without a limited instruction by the court, if such limited instruction had been requested, we likewise fail to find in the record in this case any request that the testimony be so limited to the purpose for which such testimony was so admitted. Also as held in the Dyer case, we likewise hold had there been a request on the part of the defendants to limit the purpose for which the testimony might be considered, it unquestionably would have been so limited by the trial court but no such request was made. See Fisher Construction Company v. Riggs, 320 S.W.2d 200 (Tex.Civ.App.) 1959, reversed on other grounds, 160 Tex. 23, 325 S.W.2d 126; Travelers Insurance Company v. Barrett, 366 S.W.2d 692, at page 695, (Tex.Civ.App.) 1963, n. w. h.; 23 Tex.Jur.2d, page 173, Sec. 122.

■ Plaintiff, in its brief, mentions its challenge to the comparability of the property and sale involved in the Loosier to Syler transfer, and the Adams' property in question, but plaintiff makes no serious argument in this regard. The testimony of the witness Winn reflects that he made a thorough investigation of the properties, and that they were more than comparable under the standards set in Hays v. State, 342 S.W.2d 167 (Tex.Civ.App.) 1960, writ ref., n. r. e. Moreover, the admissibility of the testimony as to comparability was within the discretion of the trial court under the standards in Holcombe v. City of Houston, 351 S.W.2d 69 (Tex.Civ.App.) 1961, n. w. h.; Melton v. State, 395 S.W.2d 426 (Tex. Civ.App.) 1965, writ ref., n. r. e.

In the trial court the plaintiff objected to the testimony of witness Browning concerning a sale of property and the consideration therein involved because it was not shown: (1) to be comparable; (2) nor was

the location from the subject property or the accessibility shown; (3) nor was its size, improvements or topography shown; and (4) whether or not it had any improvements in the nature of houses, barns, ct cetera. In the case of Holcombe v. City of Houston, supra, the court said:

> "We are of the view that appellant would have had the trial court and would have us be more restricted than the settled law requires. As to comparability, appellant in effect urges there must be practical, if not absolute, identity in shape, area and environment. There is no such legal requirement. The law does require comparability but not that the tracts be identical. Comparability is a relative term and is used in cases of this kind more in the sense of similarity to such degree that the sales price of one will be an indication of the value of the other and will thus assist in determinating the value of the tract in question."

This court in State v. Helvey, 375 S.W. 2d 744 (Tex.Civ.App.) 1964, n. w. h., said:

> "It may safely be said that no two tracts of land are exactly alike. The question of whether or not they are sufficiently similar to afford a fair and reasonable basis for consideration, or shedding light on the value of the land in question, is a matter within the sound discretion of the Trial Court." Also see Melton v. State, supra.

As to plaintiff's complaint to witness Mack Adams testifying to the consideration of $400.00 being paid for a small tract just across the road from the subject tract in question, the record shows the following occurrence upon the trial of this case:

> "Q * * * Have you been interested in the selling or the purchasing of any other farm land; whether you bought it or not, have you been interested in it?
>
> "A Yes.
>
> "Q You have appraised it from the standpoint of buying it?

> "A Quite a few tracts.
>
> "Q All right. Tell us about some of those that you have actually had experience with, of your dealing with it to the extent that it's affected your opinion of market value one way or the other.
>
> "A The small tract just across the road from this tract in question that sold for $400.00 an acre."

At this point the plaintiff interposed the following objection to the last answer made by witness Mack Adams:

> "If Your Honor please, we move to strike the testimony of the witness as to what another piece of land sold for because it has not been shown to be comparable to the subject property. And furthermore for the reason that it's not responsive to any question asked of the witness.
>
> "Q (Mr. Fields) Mr. Adams, without telling any of the prices, just answer my question as best you can, without setting any price. We will have time to do that.
>
> " * * *
> "THE COURT: I overrule your objection.
>
> " * * *
> "Q (Mr. Fields) Mr. Adams, without giving any price of sale, just tell us what experience you have had in keeping up with the value, market values of property in and around Henderson County."

■ We think it is apparent that portion of witness Adams' testimony as to what the tract sold for was strictly descriptive, not intended to show a comparable sale, not asked for as a sale price on a comparable sale. Without doubt, it was unresponsive. Even though we think the court erred in not striking that portion of the witness's testimony, we also think it was harmless error since it is not shown to have prejudicial effect upon the jury verdict, which found the market value of defendants' property to

be around $190.00 per acre, and when considered in the light of other testimony as to the market value of defendants' property, which is shown by the following chart:

| Witnesses' Comparable Sales Testimony | Witnesses' Opinion of Market Value Testimony on Adams' Place Before Taking | Witnesses' Opinion of Market Value of Adams' Remainder Before Taking | Witnesses' Opinion of Market Value of Remainder After Taking |
|---|---|---|---|
| APPELLEES' WITNESSES | | | |
| Adams | $190/acre | $250,990 | $165,125 ($125/acre avg.) |
| Loosier sale ($210/acre) | | | |
| Jones | $200/acre | $264,200 | $198,150 ($150/acre avg.) |
| Deupree | $200/acre | $264,200 | $198,150 ($150/acre avg.) |
| Browning | $215/acre | $284,015 | $184,940 ($140/acre avg.) |
| Grimes sale ($240/acre) | | | |
| Winn | $200/acre | $264,225 | $211,380 ($160/acre avg.) |
| Loosier sale ($210/acre) | | | |
| Compton sale ($306/acre) | | | |
| APPELLANT'S WITNESSES | | | |
| Faulk | $175/acre | $231,000 | $231,000 ($175/acre avg.) |
| Anderson | $175/acre | $231,000 | $231,000 ($175/acre avg.) |
| Coates sale ($121.15/acre) | | | |
| JURY FINDINGS | Market Value of Adams' Place Before Taking | Market Value of Adams' Remainder Before Taking | Market Value of Adams' Remainder After Taking |
| | $190/acre* | $250,990 | $224,570* ($170/acre avg.) |

———◆———

From the testimony of both the plaintiff's and defendants' witnesses as to the value of the property in controversy as reflected by the above chart, it is clear that

* As figured by mathematical division of jury verdict to find per acre average value found on the tract in question.

the jury verdict was not based on any of the comparable sales mentioned, and that the jury found the value of defendants' property to be less than that indicated by any of the comparable sales testimony being complained about; and further that the jury findings were well within the testimony of the witnesses as to the market value of the Adams' property which ranged from a low of $175.00 an acre testified to by plaintiff's witnesses, to a high of $215.00 per acre as testified to by defendants' witness Browning. Since the jury verdict was not a reflection of any of the sales testimony objected to in plaintiff's first four Points of Error, and since there was other competent testimony upon which the verdict might rest, if the court did err in admitting the testimony complained of, which we do not so hold, the admission did not constitute harmful error under Rule 434, Texas Rules of Civil Procedure. State v. Hamman, 377 S.W.2d 727 (Tex.Civ.App.) 1964, n. w. h.; State v. Powell, 376 S.W.2d 929 (Tex.Civ. App.) 1964, n. w. h.; and Panhandle Eastern Pipe Line Company v. Jackson, 306 S.W.2d 145, 149 (Tex.Civ.App.) 1957, n. w.h. Plaintiff's Points 1–4 are overruled.

Plaintiff next contends that: (1) "The trial court erred in excluding evidence of the topography of the subject property." (2) "The trial court erred in excluding a topographical map of the subject property, Plaintiff's Exhibit No. 1." (3) "The trial court erred in excluding evidence that the subject tract of land was not suitable and adaptable to a lake use." These contentions are overruled.

On direct examination, Mack Adams, one of the land owners, was asked the following questions and gave the following answers:

"Q  When you bought that property what were your intentions as far as improving it at the very time that you entered into this contract?

" *  *  *

"A  We wanted to improve it to carry more cattle than were being carried on the place. We intended to build a land-ing strip and later on a shop for equipment, have all on one area. And, of course, in line with raising the cattle we wanted to—there was quite a bit of land that was in a waste state that we thought we could reclaim very cheap, and improve the carrying capacity so it would be a profitable cattle operation. And you could build over a 500-acre lake on the place very easily. We had that in the back of our mind on the value standpoint, that it might have more value with a lake on it since it is in a resort area, than it would be for the cattle. We started off with cattle but we were approached shortly after we bought it, a party interested in building a lake on it.

" *  *  *

"Q  All right. Mr. Adams, in arriving at your market values, along with the other things that you have told us you took into consideration such as your experience in buying and selling property and appraising property, and your knowledge of actually improving the property and farming and ranching, did you take into consideration the uses that Texas Power & Light Company can actually put this 38 acres to under this easement?

"A  Yes.

"Q  Now, if you were to build this lake that you have planned, would any of these towers be in it?

"A  Yes, they would."

Again, on direct examination, defendants' expert witness, T. N. Winn, testified as follows:

"Q  (Mr. Fields)  Mr. Winn, let me ask you this: what do you consider in your opinion as a real estate expert, to be the highest and best uses of Mr. Adams' land, 1359 acres, before they hit him with this condemnation?

"A  Well, the entire tract, it would be for cattle, farming, with some recreation and wild life, but for the frontage area you still have some possibility of selling

rural farm-sites. And, in my opinion, there is a very definite possibility of a considerable sized lake and, if you wanted to turn the entire area into a recreation area."

In rebuttal to the above testimony concerning the possibility of the construction of a lake on this property, the plaintiff sought to prove that the terrain and topography in fact were totally unsuitable for the construction of a lake. Two expert witnesses were called upon by the plaintiff to establish the truth of this contention.

The first of these witnesses was Richard Wiggins, a graduate civil engineer who was presently employed as an engineer for Texas Power & Light Company where he had been so employed for approximately three years. Mr. Wiggins testified that he had obtained a map of the topography of Mr. Adams' property which was a reproduction, a blow-up, of a U.S. Coast and Geodetic Survey Map. He also testified that he had been upon the Adams' property and compared that piece of property to the map. And that the map appeared to be accurate in showing the topography of the Adams' property. Witness Wiggins had drawn on this map (which was a reproduction, a blow-up, of a U.S. Coast and Geodetic Survey, not produced by the witness or its authenticity otherwise proven) with orange coloring the 320-foot elevation. Also shown thereon is the location of the Adams' property by outlining its boundaries in red. It was plaintiff's intention and purpose to show by the witness Wiggins that from the contour lines and elevations as shown on the map that it would be impossible to construct a lake on the property. He offered the map (Plaintiff's Exhibit No. 1) into evidence for the purpose of showing that it accurately portrayed the relative elevation of the Adams' tract of land and the contour lines and showing the hills, to which defendants objected and the objection was sustained by the court. This exhibit was offered in evidence for the limited purpose of showing the relative contour lines, the relative elevations, and not for the truth or accuracy of the exact sea-level elevation.

Defendants objected to the offer of plaintiff's Exhibit No. 1 on the ground that it had not been proved to be accurate and that it was strictly hearsay by this witness.

On voir dire examination, Mr. Wiggins testified: that he had not surveyed the property; that he had no personal knowledge of any of the lines shown on the map that he was attempting to testify to before the jury. At this point, the defendants further objected that it was guesswork on the part of the witness Wiggins and had not been properly proved up.

Following these objections, Mr. Estes, attorney for plaintiff, stated to the court:

"If Your Honor please, the witness has testified that he has looked at the property and has inspected the property and has compared it with this map and says that it's correct, and we think that it's admissible.

"Mr. Fields: Let me have a little more voir dire, if it please the Court.

"Mr. Estes made the statement that you have been out on the ground and compared it with these elevations, and because you have been out there you know that these elevations are right; are you telling this jury that on your oath, Mr. Wiggins?

"THE WITNESS: The undulations on the map—

"MR. FIELDS: Listen to my question, if you don't mind. Are you telling this jury that these elevations you have drawn in, 320 elevation line on this map, that you did that by going out on the ground and inspecting the land?

"THE WITNESS: I merely colored in that contour line. It was there on the original map.

"MR. FIELDS: And you didn't prepare the original map, did you?

"THE WITNESS: I say, it's a U.S. Coast & Geodetic Survey map.

"MR. FIELDS: Answer my question. You did not prepare this map?

"THE WITNESS: No sir.

"MR. FIELDS: Have you ever surveyed one inch of land on any elevation on the Adams' property that is involved in this lawsuit?

"THE WITNESS: No.

"MR. FIELDS: Well, are you intending to tell this jury under oath that you know where any elevation line is on Mr. Adams' property?

"THE WITNESS: This map—

"MR. FIELDS: I didn't ask you anything about this map. I am asking you, are you trying to tell this jury that you personally know any elevation of any one inch of this 1359-acre ranch that is involved in this lawsuit?

"THE WITNESS: No.

"MR. FIELDS: All right, sir.

"MR. DOUGLAS: If Your Honor please, the witness has testified previously that he is a civil engineer. He testified just a moment ago that he took a U.S. Coast and—

"MR. FIELDS: Your Honor, we object to any U.S. Geodetic Survey map that is not in evidence here. There is no way he can prove it up. It is just wholly immaterial. And these lawyers, through this witness, are continuously trying to get some hearsay testimony in here. We object to it, ask the Court to instruct them to stop such questions. They're immaterial. They're trying to get some hearsay evidence before this jury through this witness, who has no knowledge whatsoever, and he's testified that he doesn't."

The plaintiff in its brief complains that the court likewise excluded the evidence of the witness Wiggins as to the impossibility of constructing a lake on the property. This is based on the testimony of plaintiff offered on its Bill of Exception (S.F. 386–395). However, the record shows that the testimony complained of was based upon the contour and elevation lines on the very map (Plaintiff's Exhibit No. 1) that the court had excluded pursuant to defendants' objection thereto.

Plaintiff offered witness Wayne Y. Anderson, whose qualification as an expert land appraiser is undisputed, who testified without objection that the building of a lake on the Adams' property was impractical and not feasible as shown by the following questions and answers on direct examination:

"Q Did it occur to you when you inspected that property that it would be possible or desirable for a landowner to build a lake on that property?

"A I considered it from the standpoint that it would be possible, the possibility of it.

"Q Did you make an investigation into the determination, or into the feasibility, practicality and so forth, of building a lake on that piece of property, maybe situating a dam somewhere down toward the southern portion of his property?

"A I did, sir.

"Q And what did you do in this investigation; what did you do?

"A Well, I did three things: first, I dicussed with Mr. Robbins whether he had ever contemplated such a thing and had any work, engineering work done on it; I secondly contacted the Soil Conservation Service, and this space was under contract with them when Mr. Robbins owned it; and I secured a map showing elevations and the whole area to ascertain the feasibility of a lake and the area it would cover.

"* * *

"Q (Mr. Estes) Mr. Anderson, did you use this information, this information and the results of this investigation in forming your opinion of the market value of Mr. Adams' property?

"A It was a consideration given to determine the highest and best use which, naturally, I would enter into the over-all appraisal.

"MR. ESTES: We offer into evidence this witness's testimony as to his conclusion concerning the adaptability, feasibility and practicality of building a lake on this property as a basis of his opinion and of his appraisal of this subject property, And I will ask you these questions in that connection:

"Q (Mr. Estes) What did you determine, Mr. Anderson, to be the practicality and feasibility of erecting a lake on that property?

"A I determined that it was impractical and not feasible for two reasons: number one, the clearing of all the hill land and the sprigging of it to grass would remove the scenic effect and cause the silting of the lake if built; and number two, all of the most fertile land on the unit would be covered by water and would destroy it as a beef cattle operation.

"Q You're talking about the bottom?

"A Yes, sir.

"Q Now, what did you determine from your investigation that you used as a basis of your appraisal as to the feasibility or the adaptability of this tract of land for building a lake?

"A The maps, elevation maps, topography maps,—

"MR. FIELDS: Your Honor, we object to that at this time to this witness testifying to something that is strictly hearsay on his part, and ask that I take him at this time on voir dire and determine that he's not.

"Mr. Anderson, I believe you stated that you had not been upon this property prior to March the 25th, 1964?

"THE WITNESS: '65.

"* * *

"MR. FIELDS: On March the 25th or since then, have you made any survey upon the ground as far as establishing the elevations out there?

"THE WITNESS: By instruments, no sir.

"MR. FIELDS: This information that you are talking about, you're basing these elevations upon, is that from something other than what you're personally acquainted with?

"THE WITNESS: Yes.

"MR. FIELDS: You have personal knowledge of?

"THE WITNESS: It's from the maps of the Soil Conservation—

"MR. FIELDS: Do you understand my question? I say, do you have personal knowledge of that? I didn't ask you where you got the map. Did you understand the question? I said do you have personal knowledge, Mr. Anderson, of any elevation out there on Mr. Adams' property?

"THE WITNESS: Not except from the maps, no, sir.

"MR. FIELDS: Your Honor, he certainly can't express something he has no knowledge of whatsoever.

"You have no knowledge?

"THE WITNESS: No.

"MR. FIELDS: You are not a licensed surveyor or anything like that, are you?

"THE WITNESS: No, sir.

"MR. FIELDS: You went out there a couple of times and you eyeballed this

valley and you know what the elevations are, is that right?

"THE WITNESS: No, sir. I looked at official maps that are approved maps.

"MR. FIELDS: Do you have something other than what somebody else gave you or told you to base this on?

"THE WITNESS: I believe that was the only way it was available, unless you hired engineers to go make a study.

"MR. FIELDS: And you did not do that?

"THE WITNESS: No, sir.

" * * *

"MR. FIELDS: And you have no personal knowledge yourself of any elevation out there?

"THE WITNESS: Except from the maps.

"MR. FIELDS: Your honor, we say that this opinion that he's expressing is based strictly on hearsay, something that is not in evidence. It's just wholly inadmissible, it's strictly based on hearsay. We say this witness cannot express any opinion as to any elevation out there.

"MR. ESTES: We do not offer this, if Your Honor please, for the truth of the matters asserted, but we offer it as a basis for his appraisal as a witness, which he stated he used this in appraising the property, and we offer it to show the jury what the witness used as a basis of forming his opinion on the value of Mr. Adams' property. And we offer it to show the jury what the witness used as a basis of forming his opinion of the value of Mr. Adams' property, not for the truth of the matters that he's testifying to about these maps and so forth.

"MR. FIELDS: Your Honor, this is certainly hearsay, and there is no exception to that hearsay rule for them to admit it's not offered to admit the truth of what he's saying, and we think it's inadmissible.

"THE COURT: Sustained."

■ It is clear that plaintiff's witnesses Wiggins and Anderson did not attempt to testify to relative elevations on the Adams' property from their own knowledge, but attempted to rely upon a map made by third persons and the authenticity of which had not been established.

■ The foregoing testimony evidences a complete lack of proper authentication of the elevation map in question, and therefore was properly excluded from evidence. Smith v. Bunch, 31 Tex.Civ.App. 541, 73 S.W. 559, 562, 1903, writ ref.

■ With regard to the purpose for which plaintiff asserted its desire to introduce the topography map (which was to show that it was impossible to build a lake on defendants' property), it seems to us that the topographic map itself and the related testimony do not establish the impossibility of such a venture, if proper damming and supporting artificial structures were constructed on the Adams' property to compensate for the alleged unfavorable drop in elevation. However, even so, the defendant, Mack Adams, did not testify extensively with regard to changing their ranch operation into a resort lake and he did not testify that building a lake would provide a "higher or better use of the property" than as ranching property. Nor did any other witness. Defendant Mack Adams did mention that he had bought the property thinking it "might" have more value as a lake site. Plaintiff's witnesses were allowed to give their independent opinions as to the flooding effects of a lake and its destructive results and impracticality. All of the comparable sales, upon which defendants' witnesses based their opinions as to the market value of defendants' property, dealt with similar ranching properties, and not resort or lake-site properties, and we think plaintiff has failed to

show how the evidence from the topographic map in question would have reduced the ultimate jury verdict in this case. The plaintiff was permitted to offer evidence into the record that it was not practical and feasible to construct a lake upon the Adams' property. Therefore, even if the exclusion of the evidence relating to the elevation lines on plaintiff's Exhibit No. 1 was error on the part of the trial court, it was manifestly harmless. State v. Clarke, 383 S.W.2d 953 (Tex.Civ.App.) 1964, n. w. h.; City of Fort Worth v. Barlow, 313 S.W.2d 906 (Tex.Civ.App.) 1958, writ ref.

In the case of Mallow v. State of Texas ex rel. City of Denton, 356 S.W.2d 705 (Tex.Civ.App.) 1962, writ ref., n. r. e., we find this statement:

> "Here the expert's knowledge has in the main been obtained from the statements, reports, maps or instruments made by third persons. Therefrom he makes the calculations upon which his testimony as to quantity is given, whether considered as factual or opinion evidence. In other words, his testimony is necessarily predicated upon evidence which is hearsay as to him, and to the case on hearing. As such it is inadmissible. Texas Law of Evidence, McCormick and Ray, Second Edition, sec. 1404, 'Opinions Based on Statements and Reports of Other Persons'."

█ The trial judge is accorded considerable discretion in ruling on the admission or exclusion of photographic evidence. McCormick and Ray, Texas Law of Evidence, Vol. 2, pp. 320-1; City of Fort Worth v. Barlow, supra; State v. Clarke, supra; Sunland Supply Company, Inc. v. State of Texas, 392 S.W.2d 369 (Tex.Civ. App.) 1965, (reversed on other grounds June 8, 1966, Tex., 404 S.W.2d 316). In the light of the entire record, if the exclusion of the map in question and the testimony of Wiggins offered on plaintiff's Bill of Exception, which was based entirely on the excluded map, was error,

(which we do not hold), it was not such error as was calculated to cause and probably did cause the rendition of an improper judgment. Rule 434, Texas Rules of Civil Procedure; Bruner v. State, 391 S.W.2d 149, 155 (Tex.Civ.App.) 1965, N.R.E.

The next two Points of Error are based upon the action of the court in sustaining defendants' challenges to jurors Ray R. Lowe and Claude Bankston.

On voir dire examination of Lowe, it was shown that he owned stock in Texas Utilities, which is a holding company and holds all of the stock for Texas Power & Light Company, the plaintiff in this case, which the effect of is that he owns stock in the Texas Power & Light Company.

█ The trial court held said juror to be disqualified under Article 2134, Vernon's Ann. Revised Civil Statutes. Subdivision 2 of said Article disqualifies any person interested, directly or indirectly, in the subject matter of the suit. Where a corporation is a party to the suit, its stockholders are necessarily interested in the result. 35 Tex.Jur.2d, page 261, Sec. 193. We think the trial court correctly sustained defendants' challenge to this prospective juror. Texas Employers' Ins. Ass'n v. Lane, 251 S.W.2d 181 (Tex.Civ.App.) 1952, writ ref., n. r. e.

█ The voir dire examination of Bankston showed that he worked for the Commissioner's Court of Henderson County in connection with the purchase of property for use as highway right-of-way, and he stated that if he were made a member of the jury, "I'd be just afraid it would put me in an embarrassing position later on because, you know that the County and the State had to go through the same thing, and which you know they will on some of it. And I'm just afraid—." He replied in response to defendants' attorney's question, that if the jury were to determine a high verdict in damages in this condemnation suit that it would put him in "an embarrassing position." Further, Mr. Bankston

admitted if he were selected as a member of the jury to hear the case that he "would be thinking about" what his future relationship would be with the people he would have to be dealing with in purchasing right-of-way. He also admitted that if he were on the jury, he would also be considering what effect the verdict that he would render in the case would have on his testifying in the future regarding his own purchasing work for the County, and that worried him. He said he would try to not let this affect him, but that he didn't know if he could do it as freely as he would like to do it, and that he felt it would be better if he didn't serve. However, in response to questions from attorneys for both plaintiff and defendants, he stated that if selected as a juror in the case, that he would do what was right and would not let this affect his verdict. He also testified that he could not erase these thoughts from his mind and reiterated that he preferred not to serve on the jury because of the possible embarrassment it might be to him in the future in connection with his employment with Henderson County. The court likewise held Bankston to be disqualified.

Without further statement from the testimony of the prospective juror Bankston, we deem it sufficient to say that in our opinion the evidence adduced on the voir dire examination did not show conclusively that such prospective juror was lacking in the qualification for jury service prescribed by Article 2133, V.A.C.S., or was disqualified for such service under the provisions of Article 2134, of said statutes, or of Article 35.16, Vernon's Ann. Civ. St. of Texas, C.C.P. A challenge for cause not based on any ground mentioned in the statutes is ordinarily addressed to the sound discretion of the trial judge whose action thereon should not be disturbed on appeal unless it clearly appears that a fair and impartial trial was thereby prevented. Bennett v. Jackson, 172 S.W.2d 395 (Tex.Civ.App.) 1943, Ref. Want Merit; Harrison v. Missouri-Kansas & T. R. Co. of Texas, 89 S.W.2d 455 (Tex. Civ.App.) 1936, err. dism.; Parker v. Traders & General Insurance Co., 366 S.W. 2d 107 (Tex.Civ.App.) 1963, (modified on other grounds, Tex., 375 S.W.2d 714). Since we cannot say that the prospective juror Bankston was disqualified by law, or that a clear abuse of discretion on the part of the trial judge was shown, with respect to his action in ruling that the said prospective juror was disqualified, this point must be overruled.

Plaintiff further contends that prospective jurors Lowe and Bankston were not disqualified and that the court erred in sustaining defendants' challenge to said prospective jurors, and that it was thereby forced to accept an objectionable juror. This contention is overruled.

The record reflects that the plaintiff did not make known to the trial court that it was forced and compelled to accept a juror who was objectionable to it until the hearing on its motion for new trial. It was after an adverse verdict and upon hearing for new trial, plaintiff for the first time made it known that one of the jurors who served at the trial was in fact objectionable. It has been held by this court in Hammon v. Texas & New Orleans Railroad Company, 382 S.W.2d 155, writ ref., n. r. e.:

"* * * that in order to complain, plaintiff would be required to show that prior to the exercise of his pre-emptory challenges, he apprized the trial court that one of the jurors was obnoxious to him and that he would have challenged that juror had he not been forced to exhaust a challenge on an objectionable juror. Galveston, H. & S. A. Ry. Co. v. Keesey, 50 Tex.Civ.App. 463, 110 S.W. 170; Kansas City, M. & O. Ry. Co. of Texas v. Weaver, Tex.Civ.App., 191 S.W. 591."

In any event, the trial court did not commit reversible error. Rule 434, T.R.C.P. provides that no judgment shall be re-

versed on appeal in any cause on the ground that the trial court has committed an error of law unless the appellate court shall be of the opinion that the error complained of amounted to such a denial of the rights of appellant as was reasonably calculated to cause and did cause the rendition of an improper judgment. Moreover, the plaintiff has failed to show the alleged improper action of the court resulted in harm and further there is no showing that it was denied a trial by a fair and impartial jury. Texas Employers' Ins. Ass'n v. Lane, supra; Bashrum v. Vinson, 330 S.W.2d 538 (Tex. Civ.App.) writ ref., n. r. e.

■ The plaintiff by its tenth Point of Error says: "The trial court erred in refusing to admit the testimony of Joe Faulk that he had been appointed to serve as a Special Commissioner by the Judge of the County Court in this case."

The record shows that plaintiff attempted to elicit from its witness Joe Faulk that he had been appointed by the Judge presiding over the trial of the case, in his capacity as County Judge of Henderson County, as one of the special commissioners, whose award for damages was objected to by the plaintiff and resulted in the institution of the case then on trial. In response to defendants' objection, the Judge excluded this testimony. The record further reflects that the witness Faulk was allowed to render his opinion of the value of defendants' property and even to mention that he had served as a special commissioner in condemnation cases in the past, to show his general experience and qualifications. He was also permitted to testify that he had had experience in making appraisals. We do not think the excluded testimony had any significant bearing, if any, on said witness's qualifications to testify to the value of the Adams' property. Therefore, the plaintiff has failed to demonstrate to this court any harm by the action of the court in excluding said testimony. Under the record before us, we think the point is without merit and same is over-

ruled. Thompson v. Janes, 245 S.W.2d 718 (Tex.Civ.App.) 1952, aff. 151 Tex. 495, 251 S.W.2d 953.

■ The only other Points presented by plaintiff allege:

1. "There is no evidence to support the jury's answer to Special Issue No. 4."

2. "There is insufficient evidence to support the jury's answer to Special Issue No. 4."

3. "There is no evidence to support the jury's finding of damages to the remainder as reflected by its answers to Special Issues Nos. 3 and 4."

4. "There is insufficient evidence to support the jury's finding of damages to the remainder as reflected by its answers to Special Issues Nos. 3 and 4."

Special Issues Nos. 3 and 4 and the jury's answers thereto are as follows:

"SPECIAL ISSUE NO. 3: What do you find from a preponderance of the evidence was the market value of the remaining 1321 acres of land of the defendants, lying outside of the easement, immediately before Texas Power and Light Company acquired the easement in question on May 4, 1964?

"Answer in dollars and cents.

"ANSWER: $250,990.00

"SPECIAL ISSUE NO. 4: What do you find from a preponderance of the evidence was the market value of the remaining 1321 acres of land of defendants, lying outside the strip of land occupied by the easement, immediately after Texas Power and Light Company acquired the easement in question on May 4, 1964?

"Answer in dollars and cents.

"ANSWER: $224,570.00."

After careful review of all the evidence, we think there is sufficient testimony to

support the jury's answers and these points are accordingly overruled. Texas Power & Light Company v. Trinity Valley Ranch Company, 395 S.W.2d 866 (Tex.Civ.App.) 1965, n. w. h.

Finding no reversible error in the record, the trial court's judgment is affirmed.