

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-14-00068-CV

---

ASHWIN J. BABARIA AND BHARTI             APPELLANTS
A. BABARIA

V.

CITY OF SOUTHLAKE, TEXAS             APPELLEE

----------

## FROM COUNTY COURT AT LAW NO. 3 OF TARRANT COUNTY
## TRIAL COURT NO. 2011-006149-3

----------

## MEMORANDUM OPINION[1]

----------

This is an appeal from a judgment in a condemnation case. The City of Southlake instituted an eminent domain action to condemn property owned by Ashwin and Bharti A. Babaria. The Babarias objected to the $97,000 award of the special commissioners, and Southlake deposited that amount into the registry

---

[1]*See* Tex. R. App. P. 47.4.

of the court. The Babarias withdrew the money, and the issue of compensation was tried to the jury. Based on the jury's verdict, the trial court signed a judgment awarding Southlake $7,000, the difference between the amount the Babarias had withdrawn from the court's registry and the amount of compensation awarded to the Babarias by the jury.

In five issues, the Babarias challenge the trial court's admission of the testimony of Southlake engineer Cheryl Taylor and of appraisal expert Charles Stearman and the trial court's denial of their motion to disregard jury findings and for judgment notwithstanding the verdict. Because we hold that Taylor's testimony was admissible, that Stearman's testimony was also admissible, and that the trial court did not err by overruling the Babarias' postjudgment motions, we affirm the trial court's judgment.

## 1. Background

Southlake planned to convert the road that runs in front of the Babarias' property from a two-lane road into a four-lane divided road with underground storm water drainage, a landscaped median, and extended sanitary sewer service. To do so, Southlake planned to condemn 0.185 acre of the Babarias' approximately eight-acre property (roughly thirty feet on the front of the property) to widen the road and another 0.067 acre part (approximately ten feet along the front of the property) for a drainage easement.

In the eminent domain proceeding, the special commissioners assessed damages of $97,000 the right-of-way, the permanent drainage easement, and a

temporary construction easement. The Babarias objected to the special commissioners' award, and Southlake deposited the amount of the award into the registry of the trial court on January 19, 2012. On the Babarias' motion, the trial court allowed them to withdraw the money before trial. The parties then tried the issue of damages to a jury.

At trial, Robert Hawkins, an appraiser testifying for the Babarias, asserted that the value for the property taken plus the damages to the Babarias' remainder property totaled $162,500.00. Hawkins testified that the property being condemned did not constitute its own economic unit, and thus his valuation testimony for the part taken was based on a 44,029 square-foot (just over one-acre) parcel of undeveloped land at the front of the Babarias' property. He testified that the parcel could be sold for a single-family residential lot, which Hawkins concluded was the highest and best use of the property. Hawkins opined that the parcel had a value of $7.00 per square foot based on a comparable sales analysis that compared the undeveloped parcel he had used as an economic unit to other unimproved properties. Based on this valuation, he stated that the value of the taken property was $87,500, plus $15,000 for fencing and gates on the property.

In testifying about damages to the remainder property, Hawkins stated that Southlake has a minimum one-acre lot size requirement for residential development and that prior to the taking, the Babarias' property included a full unencumbered acre that could be sold as a single family residential lot. After the

3

taking, however, the Babarias would only have a full acre to sell if they included a thirty-foot strip on the property that was already burdened with a utility easement and power line. He testified that including this thirty-foot strip and taking into account Southlake's setback requirements would limit the size home that could be built on the lot and decrease the amount a buyer would pay for it. Hawkins concluded that the remainder damages were $60,000.

Southlake called city engineer Cheryl Taylor and appraisal expert Charles Stearman to testify. When Southlake's attorney asked Taylor if she was familiar with the application of Southlake's subdivision ordinance to proposed replats[2] of property, the Babarias' attorney objected, "[H]e's launching into questions to lay the basis as an expert. He's asking her as an expert her opinion about the plans and the effects on this property." Their attorney objected to Taylor "talking about the ordinance or how it applies to this property because that is an interpretation of law[,] . . . and that is an expert opinion." She further objected that Taylor had not been designated as an expert witness.

After hearing an offer of proof outside the jury's presence, the trial court sustained the objection in part and overruled the objection in part. The court ruled that Taylor could testify that a portion of the property had previously been dedicated under a requirement of the subdivision ordinance. The court further ruled that Taylor could *not* testify about whether the subdivision ordinance would

---

[2]The reporter's record states that the attorney asked about "three plats," but from the context we assume it should read "replats."

4

require a platting of the economic unit proposed by Hawkins and, if so, whether the subdivision ordinance would require a dedication of a portion of the Babarias' property in that platting.

Stearman's report—on which his testimony was based—was dated October 7, 2011, not the January 19, 2012 date of taking. When Stearman began to testify about his valuation opinion, the Babarias objected to his testimony on the ground that his report was not evidence of value as of the January 19, 2012 date of taking,[3] he had never supplemented his report, and Southlake had never supplemented its discovery responses to support a valuation as of the date of taking. Thus, they argued, his testimony about market value should be excluded. The trial court allowed Southlake to question Stearman about whether there was any need for him to do further analysis (he answered no) and whether his October 2011 opinion was equally applicable to the January 2012 date of taking (he answered yes).

The Babarias' attorney objected that Stearman had done no analysis from which he could draw the conclusion that the market had not changed between October 2011 and January 2012. She characterized Stearman's testimony as "saying the date of condemnation doesn't matter."

---

[3] *See* Tex. Prop. Code Ann. § 21.021 (West 2014) (stating that the condemnor may take possession of condemned property pending the results of further litigation if the condemnor deposits with the court the amount of money awarded by the special commissioners as damages).

5

After some discussion of case law outside the presence of the jury, when the Babarias' attorney interrupted the trial court, the court ruled, "Okay. Well, if y'all don't care what I have to say, then I'll overrule your objections and [Southlake's attorney] can continue." The Babarias' attorney asked whether she should make the rest of her objections before the jury was brought back in, and the trial court responded, "You're welcome to do so, although I guess you're not going to want to listen to what I have to say. But I will say you're overruled without providing the rationale."

The Babarias' attorney apologized for interrupting the trial court and then objected that Stearman had not used a valid appraisal methodology because he had used sales of unimproved properties to determine a value for the part taken, even though he used the Babarias' entire property as the basis for comparison and the Babarias' property is improved. The trial court overruled the objections.

Stearman then testified about his valuation opinion. Because the property taken was too small to constitute its own economic unit, Stearman used the Babarias' entire property as an economic unit. He then found comparable sales of vacant land in the area to come up with a per-square-foot value for the vacant land taken. Stearman testified that his opinion of the value of all the land rights to be acquired plus the value of any site improvements located on the land acquired was $75,740, plus $1,830 for a temporary construction easement, for a total of $77,370.

The jury rendered a verdict finding $90,000 as the fair market value of the part taken and finding no damages to the remainder property. The Babarias filed a motion to disregard the jury's verdict and for judgment notwithstanding the verdict (JNOV), requesting that the trial court render a judgment in their favor for $162,500. The trial court denied the motion and signed a judgment on the verdict. Because the Babarias had already withdrawn the $97,000 deposited in the court's registry, the trial court ordered that Southlake recover $7,000 from the Babarias.

The Babarias filed a motion for new trial and a notice of appeal. The trial court subsequently rendered an amended final judgment (noting that property lienholders had been nonsuited) to address concerns raised by this court about whether the prior judgment disposed of all parties. The motion for new trial was overruled by operation of law, and the Babarias now appeal.

**2. Discussion**

*2.1. Civil procedure rule 193.6 did not require the exclusion of Stearman's testimony*

In their first issue, the Babarias assert that the trial court erred by not excluding Stearman's opinion testimony under civil procedure rule 193.6.[4]

Civil procedure rule 193.6 requires the exclusion of evidence or information that was not timely disclosed in an initial, amended, or supplemental discovery

---

[4]Tex. R. Civ. P. 193.6.

7

response.[5]  Exclusion is not required, however, if the trial court finds that there was good cause for the failure to disclose or that the failure to disclose will not unfairly surprise or unfairly prejudice the other parties.[6]  The Babarias argue that Southlake never disclosed Stearman's opinion of market value as of January 19, 2012 and did not show either good cause for the failure to disclose or that they would not be prejudiced by the testimony.

The basis for the Babarias' argument under this issue is a statement in Stearman's report that the value opinion within it was reliable only as of October 7, 2011.  At trial, the Babarias' attorney objected that "there's been no showing that [Stearman] supplemented anything showing that he did any analysis of the market between October and January," and that if he had done such an analysis, Southlake "did not supplement and provide it to us."

The trial court allowed Stearman to testify to address "those foundational issues," with a warning that the objection would be sustained "if the connection is not made."  Stearman then testified that the appraisal report and his opinions in the report were equally applicable to both the date of his original valuation and the later date of taking, so no additional analysis was necessary.

Outside the presence of the jury, the trial court asked Southlake what it had disclosed to the Babarias in discovery about Stearman's testimony.

---

[5]*Id.*

[6]*Id.*

Southlake's attorney read out the disclosure, which notified the Babarias that Stearman would testify about the fair market value of the property rights acquired by Southlake and about a lack of any damage to the remainder property after those property rights were acquired.

This response disclosed to the Babarias that Stearman would be testifying about the fair market value of the part taken and about how the taking affected the value of the remainder. The basis of Stearman's expected testimony—his appraisal report and his appraisal summary—were attached to the disclosure. Thus, this response, along with Stearman's report, disclosed the subject matter of Stearman's testimony, the general substance of his mental impressions and opinions, and a summary of their basis. Although his report is not in the record, the parties agree that his testimony at trial was consistent with his report. Nothing about Stearman's expected testimony that needed to be disclosed under civil procedure rule 194.2(f)[7] changed between the date of the report and the date of trial.

Disclosure rules "require that opposing parties have sufficient information about an expert's opinion to prepare a rebuttal with their own experts and cross-examination, and that they be promptly and fully advised when further developments have rendered past information incorrect or misleading." [8]

---

[7] Tex. R. Civ. P. 194.2(f) (setting out requirements for disclosures with respect to expert testimony).

[8] *Exxon Corp. v. W. Tex. Gathering Co.*, 868 S.W.2d 299, 304 (Tex. 1993).

Stearman's testimony about the value of the property on January 19, 2012 was based on information included in his report, and Southlake disclosed the report to the Babarias. Nothing in the record shows that there were any further developments that rendered the past information disclosed by Stearman incorrect or misleading. Therefore, Southlake had no duty to supplement.[9] And because the basis of Stearman's testimony was disclosed to the Babarias, the purpose of the rule was satisfied by Southlake's disclosure.[10] Regardless of whether the testimony should have been excluded on some other basis, we cannot say the trial court abused its discretion[11] by overruling the Babarias' rule 193.6 objection. We overrule the Babarias' first issue.

*2.2. The date on Stearman's report did not make his testimony inadmissible under Texas eminent domain law*

In their second issue, the Babarias again challenge Stearman's testimony based on the date of his report, this time on the basis that the date of the report

---

[9] *See* Tex. R. Civ. P. 193.5 (requiring an amended or supplemental responses to written discovery when a party learns that a previously-made response is no longer complete and correct).

[10] *See Tex. Mun. League Intergovernmental Risk Pool v. Burns*, 209 S.W.3d 806, 817 (Tex. App.—Fort Worth 2006, no pet.) (stating that the purpose of the rule "is to require complete responses to discovery so as to promote responsible assessment of settlement and prevent trial by ambush") (footnote and quotation marks omitted); *see also* Tex. R. App. P. 44.1 (setting out the standard for reversible error on appeals).

[11] *See $27,877.00 Current Money of U.S. v. State*, 331 S.W.3d 110, 120–21 (Tex. App.—Fort Worth 2010, pet. denied) (reviewing a trial court's ruling on a rule 193.6 objection for abuse of discretion).

10

made his trial testimony unreliable.  They argue that because Stearman's valuation in the report was rendered as of a date other than the date of taking, and he provided no analysis at trial to explain why that valuation was also valid for the date of taking, his testimony was unreliable and therefore inadmissible.

Expert testimony must be relevant to be admissible.[12]  To be relevant, expert testimony must assist the jury in determining an issue or in understanding other evidence.[13]  Expert testimony is not relevant if it is unreliable.[14]  If expert testimony is based on an unreliable foundation or flawed methodology, it is not reliable and therefore not relevant.[15]

At trial, when Stearman was asked about his opinion on market value, the Babarias' attorney objected that Stearman's own appraisal stated that "use of this appraisal for any date other than October 7[, 2011] makes it unreliable." Although Stearman's report does not appear in the record, Stearman agreed that the report stated that the market value opinion included within it was only reliable on October 7, 2011.

---

[12]*TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 234 (Tex. 2010).

[13]*Id.*

[14]*Id.*

[15]*Id.*

As a general rule, sales occurring within five years before the taking are not too remote to be admissible as evidence of fair market value.[16] Thus, the fact that Stearman used comparable sales that occurred before the taking did not make his opinion testimony based on those sales unreliable. The Babarias direct us to no evidence in the record, from their expert or anyone else, that there were significant changes in the marketplace occurring in the three-month period between October 2011 and January 2012. The Babarias make no complaint about the dates of the sales used by Stearman or about the fact that Stearman used those sales to develop an opinion on market value. Their complaint is based entirely on the statement Stearman included in his report that his opinion expressed therein was only reliable as of October 7, 2011.

Stearman explained at trial that he puts a statement in all of his appraisal reports restricting the report's applicability to dates other than the date of the report. He explained that he does this

> [a]s an appraisal matter, to place a limit, if you will, on someone['s] using the report for some purpose other than its intended use. To

---

[16] *See Holiday Inns, Inc. v. State*, 931 S.W.2d 614, 623 (Tex. App.—Amarillo 1996, writ denied) ("Generally, however, the admission of evidence of sales occurring within five years of the date of taking of the subject property may be appropriate."); *Bd. of Regents of Univ. of Tex. Sys. v. Puett*, 519 S.W.2d 667, 672 (Tex. Civ. App.—Austin 1975, writ ref'd n.r.e.) (upholding admission of comparable sales four and a half years before the taking); *Hays v. State*, 342 S.W.2d 167, 171–72 (Tex. Civ. App.—Dallas 1960, writ ref'd n.r.e.) (citing cases involving comparable sales occurring three to five years before the taking and holding that, absent evidence of a material change in the real estate market between the date of the sales and the date of the taking, sales of three years' difference between sale and taking were acceptable).

me, if I say the effective date is today, then I don't want you to use that value for either a retrospective date or a prospective date without [my] saying so.

It appears, then, that the statement was intended as a method to prevent unauthorized use of the report.[17] It was not an assertion that the market was in flux and thus that the opinions within the report would necessarily be invalid any other day.

We agree with the Babarias that the date of taking in this case was January 19, 2012. We also agree that the fair market value of property in condemnation cases is generally determined by "measuring the difference in the value of the land immediately before and immediately after the taking."[18] But we disagree that Stearman's testimony should have been excluded because of the statement about the October 2011 date in his report.

The case that the Babarias primarily rely on is *Topletz v. State*,[19] an unpublished opinion of no precedential value from a sister court of appeals.

---

[17] *See Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 922 (Tex. 2010) (discussing *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 575 (Tex. 2001), and when statements in a report, when relied on by a third party, may support a claim for fraud); *see also* Restatement (Second) of Torts § 552 & cmts. (1977) (discussing negligence claims based on information negligently supplied for the guidance of others and listing cases in which appraisers had been sued by third parties for negligent misrepresentation based on statements in appraisals).

[18] *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 627 (Tex. 2002).

[19] No. 05-93-00815-CV, 1994 WL 384411 (Tex. App.—Dallas July 25, 1994, writ denied) (not designated for publication).

Given the case's status, we do not place as much importance on it as the Babarias do. To the extent we would be inclined to assign the case any weight, it is distinguishable.

In that case, the Dallas court of appeals addressed the trial court's exclusion of testimony by Topletz's four valuation experts.[20] None of the experts' reports were dated the date of the taking.[21] The State asked the trial court to limit each expert's testimony to the opinions expressed in Topletz's discovery responses, which contained the reports.[22] After the trial court granted the State's request, the State then objected to the testimony of each of Topletz's experts as irrelevant because the dates of the experts' reports were different from the date of the taking.[23] The trial court granted the objections.[24]

The Dallas court of appeals held that three of the experts should have been allowed to testify.[25] In the reports of those three experts, despite having report dates different from the date of the taking, the experts had included statements that they had developed opinions of the value of the property as of

---

[20]*Id.* at *4.

[21]*Id.* at *1.

[22]*Id.*

[23]*Id.*

[24]*Id.*

[25]*Id.* at *3.

14

the date of taking.[26]  The fourth expert did not state in his report that his purpose was to form an opinion of the value of the property at the time of the taking and the damages to the remainder resulting from the taking; the report simply estimated a fair market value of the property as of April 2, 1990, nineteen months before the taking.[27]  The court of appeals upheld the trial court's exclusion of the fourth expert's testimony as irrelevant.

In this case, as noted above, Southlake stated in its discovery disclosures that Stearman "will testify as to the fair market value of the property right sought to be acquired by this action, as well as the lack of damage to the property of the landowners remaining after the acquisition of the property right sought in this case."  Thus, unlike in *Topletz*, Southlake's discovery response indicated that Stearman's testimony would include testimony about market value after the date of the taking, making his testimony relevant.

And, as stated, we do not have Stearman's report in the record, nor do we have the summary of his report.  We cannot tell whether, from the rest of his report, he indicated an opinion of market value as of the future date of the taking. We do have Stearman's explanation at trial for the statement about the reliability of the value on a date other than in October 2011.

---

[26]*Id.*

[27]*Id.* at *4.

Although the Babarias' attorney attempted at trial to characterize Stearman's testimony as saying that "the date of condemnation doesn't matter," that was not Stearman's position. Stearman never alluded to or expressed a belief that the date of the taking was irrelevant. Instead, he explained that there was no need to do another analysis three months later for him to know that his opinion of the property's fair market value in October 2011 was also true as of January 19, 2012.

As an expert, Stearman was qualified to know if market conditions had shifted. The Babarias argue that Stearman's "ipse dixit claim that the valuations and opinion he originally reported to be reliable only as of October 7, 2011, were likewise just as valid for a valuation measured as of the date of the take" rendered his testimony no evidence at all. We disagree. If nothing had happened in the market in the three-month period between the date he wrote the report and the date that Southlake deposited the funds into the court's registry, Stearman was not required to conduct an entirely new analysis and update his report.

The record indicates that Stearman understood when he needed to look at new sales data. Stearman testified at trial that he had done an initial report in February 2011, and when he updated his report in October 2011, he replaced an older sale he had used with a more recent sale. This is the same kind of expertise—knowing whether there has been shift in the marketplace or whether

16

new sales data should be looked at—that allows an expert to use sales even years before the date of taking to establish a value on the date of the taking.[28]

Stearman testified to a per-square-foot and total value of the entire property before the date of taking and a per-square-foot and total value of the taken piece, which would be subtracted from the total as of the date of taking; he also testified that the value of the remainder property would not change as a result of the taking. He based his opinion on an appraisal report that he had last updated three months before the date of taking, but he nevertheless opined that the sales figures in the appraisal report were still applicable as of the date of taking. This is no different from any other expert's testimony at trial based upon a report completed before trial. The issue, then, is whether the three-month gap between the report and date of taking made the basis of Stearman's conclusion in the report too remote; we hold that—in the absence of any evidence indicating that the market had changed significantly during that three-month period—the trial court did not abuse its discretion by determining that it was not. We have found no case law indicating that an expert's appraisal forming his or her opinion of the value of property as of the date of taking must be performed on the date of the taking itself to be valid.

Stearman's testimony was relevant because it expressed an opinion of market value as of the date of taking. His testimony was not unreliable simply

---

[28]*Cf. Hays*, 342 S.W.2d at 171–72.

because his report had been written after Southlake had initiated condemnation proceedings but three months before Southlake deposited the funds into the registry. We cannot say that the single statement in Stearman's report pointed out by the Babarias made Stearman's testimony irrelevant and thus unreliable, and we therefore cannot say that the trial court abused its discretion by admitting his testimony. We overrule the Babarias' second issue.

### 2.3. Stearman's appraisal methodology was permissible

In their third issue, the Babarias contend that the trial court abused its discretion by permitting Stearman to testify because he used an improper methodology to value the condemned property.[29] In a partial taking, there are two methods for submitting the issue of compensation to the jury—the *Carpenter* approach and the *Uselton* approach.[30] "The trial court has discretion to determine whether the *Carpenter* or *Uselton* approach should be used, given the circumstances of the particular case."[31] Under the *Carpenter* approach, two questions should be submitted, asking the jury to find "first, the market value of the part taken, considered as severed land, and second, damages to the

---

[29] *See State v. Chana*, 464 S.W.3d 769, 786 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (observing that appellate courts review a trial court's decision to admit or exclude evidence for an abuse of discretion).

[30] *Westgate, Ltd. v. State*, 843 S.W.2d 448, 456–67 (Tex. 1992) (describing the methods for jury submission set out in *State v. Carpenter*, 89 S.W.2d 194 (Tex. 1936), and *Uselton v. State*, 499 S.W.2d 92 (Tex. 1973)).

[31] *Id.* at 457.

remainder, accompanied by an instruction that such damages should be determined by considering the difference between the remainder's pre-and post-taking value."[32] In this case, the trial court submitted the *Carpenter* questions.

The Babarias' complaint under this issue is that Stearman was allowed to testify based on a methodology that failed to value their property as it existed before and after the taking.[33] Specifically, they take issue with the fact that Stearman determined a value of the vacant land taken by using comparable sales of unimproved property but, in determining the price per square foot, used the Babarias' entire property, which is not vacant, as an economic unit.

The record raises the possibility that Stearman did include at least one property with a house on it in his appraisal. The Babarias' attorney asked Stearman if he had considered in his analysis a sale of a significantly smaller property close to the Babarias' property. Stearman testified that he thought he had, but he could not remember if he had valued the house or just the land, and he would need to look at his report to refresh his memory. The Babarias' attorney moved on to other questions without giving the report to Stearman to look at; therefore, the question of whether that property was including in Stearman's analysis was not resolved. We will assume for our analysis that this property sale was not included.

---

[32] *Id.*

[33] *See TXI Transp. Co.*, 306 S.W.3d at 234.

When condemned property cannot be considered an independent economic unit, "the market value [of the part taken] must necessarily be determined by considering some portion or all of the remainder in order to construct an economic unit."[34] In this case, both sides agreed that the part taken by Southlake did not constitute its own economic unit. To find a value for the part taken, Stearman used the Babarias' entire eight-acre property as an economic unit. Using the entire property as an economic unit is an accepted method of determining the value of the land condemned in a partial taking.[35]

Stearman concluded that the highest and best use of the property[36] was the use it currently had at the time of the taking—as a mansion estate. Stearman's conclusion to that effect was not only permissible, it was in accordance with the legal presumption that a property's current use at the time of condemnation is its highest and best use.[37]

---

[34] *State v. Windham*, 837 S.W.2d 73, 76 (Tex. 1992).

[35] *See id.*

[36] *See City of Sugar Land v. Home & Hearth Sugarland, L.P.*, 215 S.W.3d 503, 511 (Tex. App.—Eastland 2007, pet. denied) (defining "highest and best use" of a property as "[t]he reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value") (citation and internal quotation marks omitted).

[37] *See Enbridge Pipelines (E. Tex.) L.P. v. Avinger Timber, LLC*, 386 S.W.3d 256, 261 (Tex. 2012) (stating that in a takings case, "[t]here is a presumption that the highest and best use of the land is the existing use of the land").

It is undisputed that the Babarias' residence was not located on the part taken. Both sides agreed that the house—which was over 840 feet from the condemned strip of land—was totally unaffected by the taking.

There was no testimony that the condemnation caused damages to the remainder because of the type of project for which the taking was instituted.[38] The difference in opinion between the experts as to damages to the remainder came from Hawkins's belief that before the taking, an unimproved section of the Babarias' property could be sold as a lot, but after the taking it could not.

In sum, it was uncontroverted that the house was not on the part taken, that the house was more than 800 feet from the part taken, that the value of the house was unaffected by the taking, and that both experts appraised the value of vacant land to reach their opinions of the amount of damages.

Stearman further concluded that, not only was there no damage to the value of the home, there was no damage to the remainder property at all— meaning no reduction in the fair market value of the Babarias' remaining land.[39] Thus, the only value for Stearman to determine was the fair market value of the

---

[38] *See, e.g.*, *Heddin v. Delhi Gas Pipeline Co.*, 522 S.W.2d 886, 887 (Tex. 1975) (addressing landowners' claim that the market value of their property was decreased substantially by reason of fear of pipelines in the minds of the buying public and discussing when fear in the mind of the buying public is relevant).

[39] *See DeSanders v. Texoma Pipe Line Co.*, 538 S.W.2d 663, 666 (Tex. Civ. App.—Texarkana 1976, no writ) (noting repeated refusal of Texas courts to hold that the taking of a portion of a tract of land diminishes as a matter of law the market value of the remainder).

vacant land taken by Southlake. To find that value, he used comparable sales of vacant tracts of land to determine a square-foot value for similar vacant land in the area, which he then applied to the land taken to estimate its value. This decision is the focus of the Babarias' issue.

Generally, improvements situated on the part taken have no market value separate from the land, but their value should be reflected in the value of the land taken.[40] The improvements are not considered for their own market value, but only so far as they affect the value of the land itself.[41] Stearman testified that even if he had appraised the entire property as improved (rather than looking only for the value of the land), his opinion of the value of the *land itself* would not have changed.

Because improvements commonly have some effect on the value of the land on which they are located,[42] as the Babarias point out, if the property taken is improved and the comparable sales method is used to find its value, then sales

---

[40] *State v. Carpenter*, 89 S.W.2d 979, 980–81 (Tex. 1936) (op. on reh'g).

[41] *See id.*; *see also Stewart v. State*, 453 S.W.2d 524, 528 (Tex. Civ. App.—Beaumont 1970, writ ref'd n.r.e.) (stating that in determining the value of the land taken when the taken land contains improvements, "the ultimate question is the market value of the land so taken" and that value ordinarily is— but may not be—enhanced by the presence of buildings on the land); c*f. Emeryville Redevelopment v. Harcros Pigments, Inc.*, 125 Cal. Rptr. 2d 12, 31– 32 (2002) (stating that rule that improvements must be taken into account in determining compensation includes taking into account when improvements decrease the value of the property below its unimproved condition).

[42] *See Stewart*, 453 S.W.2d at 528.

of similarly-improved property should be used to find the condemned property's value.[43]  If the property taken is unimproved, the sales of unimproved property should be used.[44]  Here, the part taken was *unimproved*, and Stearman used sales of unimproved property to find the value of that land.

It is true that the Babarias' remainder property is improved.  Had Stearman used the objected-to comparable sales to support testimony about the market value of the Babarias' remainder property after the taking, he would have needed to use sales of improved property.[45]  But Stearman did not use the comparable sales to find the market value of the remainder.  Stearman used the sales to find the value of the Babarias' land and thus the value of the vacant part taken by Southlake.[46]

---

[43] *See City of Austin v. Cannizzo*, 267 S.W.2d 808, 816 (1954); *Chaney v. Coleman*, 13 S.W. 850, 851 (1890) (stating that in showing the value of an improved farm, "[b]efore a value can be given to it by proving the average value of farms in that vicinity, it should be proved that the improvements, and other things to be considered in estimating its value, correspond with like things and the farms with which it is classed").

[44] *Cannizzo*, 267 S.W.2d at 816.

[45] *See id.*

[46] *Utley v. LCRA Transmission Servs. Corp.*, No. 04-05-00023-CV, 2006 WL 3017127, at *4 (Tex. App.—San Antonio Oct. 25, 2006, no pet.) (mem. op.) (considering expert's appraisal opinion rendered on the value of the appellant's property as unimproved because, in the expert's opinion, the partial taking had no effect on the improvements located on the remainder over 4,000 feet away from the power line placed on the taken property and holding that, under the facts of that case, the trial court did not abuse its discretion by admitting the expert's testimony); *cf. Harris Cty. Appraisal Dist. v. Houston 8th Wonder Prop., L.P.*, 395 S.W.3d 245, 255–56 (Tex. App.—Houston [1st Dist.] 2012, pet. denied)

Because the value per square foot of land can be affected by the size of the property (Hawkins agreed that as a general proposition, the smaller the land, the higher the value per square foot),[47] Stearman needed to find the value of property similar to the Babarias' property to give him an idea of the value per square foot of the strip taken by Southlake. And that is what he did. The Babarias do not challenge Stearman's qualifications as an expert to evaluate other tracts of vacant property and determine if they were similar enough to the Babarias' land for the other tracts to accurately indicate a value for the Babarias' land.

We note that in order for an expert appraiser to be able to determine how much improvements affect the value of the land, the expert should be able to first find the value of the land itself.[48] That is, if an expert can determine how much

---

(holding, in a case involving the valuation used in a tax appraisal, that the trial court did not abuse its discretion by permitting the appraisal expert to testify based on the comparable values he used in his analysis even though the properties he used were improved and the subject property was vacant).

[47] *See, e.g.*, *Williams v. State*, 406 S.W.3d 273, 288 n.6 (Tex. App.—San Antonio 2013, pet. denied) (quoting an expert's opinion that "[s]maller tracts generally sell for more per square foot than do larger tracts"); *Waterways on Intercoastal, Ltd. v. State*, 283 S.W.3d 36, 40 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (noting expert testimony that smaller tracts have a higher price per acre).

[48] *See State v. Adams*, 489 S.W.2d 398, 401 (Tex. Civ. App.—San Antonio 1972, writ ref'd n.r.e.) ("[I]f the question of the value of land and improvements may properly be determined by adding to the value of the land the extent, if any, to which the improvements enhance the value of the land, it necessarily follows that separate evidence concerning the value of the land alone is admissible.").

improvements increase or decrease the value of land, the expert must also be able to determine the value of the land—the expert must have a base value to adjust up or down to reflect the effect of the improvements.[49]

Other than the question of improvements, the Babarias do not argue that the comparisons were so attenuated that Stearman could not make adjustments for the differences between the Babarias' property and those compared.[50] The Babarias do not challenge the sales Stearman used as being of land too dissimilar to the Babarias' land aside from the issue of improvements—they do not, for example, argue that the sales were of property too far away from their own to be comparable or were for differently-zoned properties.[51] They only argue that because there is a house located on their remainder property, in calculating the value of the vacant land taken by Southlake, Stearman could not use sales of vacant land.[52] We hold that it was not improper for him to do so,

---

[49] *See id.*

[50] *See City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001) (holding that with respect to the admission of comparable sales evidence, if the comparison is so weak that that the appraiser and fact-finder cannot make valid adjustments for the differences between the comparison sale property and the condemned property, the trial court should refuse to admit the sale as comparable).

[51] *See Collin Cty. v. Hixon Family P'ship, Ltd.*, 365 S.W.3d 860, 870 (Tex. App.—Dallas 2012, pet. denied) (discussing requirements for comparable sales).

[52] *But see Westmoreland v. Beaumont ISD.*, 524 S.W.2d 323, 325 (Tex. Civ. App.—Beaumont 1975, writ ref'd n.r.e.) (citing *State v. Chavers*, 454 S.W.2d 395, 397 (Tex. 1970), for the proposition that an expert *may* consider sales of improved land as a part of his mental processes in arriving at his opinion as to

and, accordingly, that the trial court did not abuse its discretion by admitting Stearman's testimony.

The Babarias argue that like the expert in *Zwahr*,[53] Stearman "determined the value of the [taking] to [Southlake], not the value of the loss" to the Babarias. The Babarias do not elaborate on this argument, and we find the case distinguishable. *Zwahr*'s expert used the area condemned by Exxon for a pipeline project as an economic unit, determined that the unit's highest and best use was as a pipeline easement, and improperly included in his valuation the enhancement to the property's value that would result from the pipeline project.[54] The expert's "final opinion reflected enhancement in the land's value that occurred only because of the Exxon project itself."[55] The Supreme Court of Texas held that the expert had determined the value of the easement to Exxon, not the value of the loss to the Zwahrs, and that this was improper.[56] In this case, however, Stearman did not use the condemnation itself to establish a separate economic unit or to assign a value to the taken property. The Babarias' reliance on *Zwahr* is misplaced. We overrule the Babarias' third issue.

---

the market value of unimproved property taken, but he cannot testify on direct examination about the facts of such sales).

[53]*Zwahr*, 88 S.W.3d at 631.

[54]*Id.* at 630–31.

[55]*Id.* at 630.

[56]*Id.* at 631.

*2.4. Permitting the testimony of Southlake's engineer was not error*

In their fourth issue, the Babarias argue that the trial court erred by permitting Southlake to present opinion testimony through its city engineer without disclosing the witness as an expert or providing any of the required disclosures regarding that testimony. We disagree.

At trial, the trial court overruled the Babarias' objection to Taylor's testimony about how Southlake's subdivision ordinance had affected the Babarias' property in the past. Taylor then testified, explaining that an area designated in red on a map shown to the jury indicated the right-of-way property that Southlake needed to complete its road expansion. Taylor stated that at the very northern end of the property was a small section that Southlake did need to purchase from the Babarias because it had already been dedicated to Southlake when the lot had been originally platted. She further explained that the dedication had occurred because Southlake's subdivision ordinance "requires dedication on city thoroughfares."

Taylor then read to the jury parts of the subdivision ordinance requiring plat applicants to dedicate to Southlake property necessary for the development of streets and thoroughfares. The ordinance clearly states that certain dedications are required for plat approval. Plats of property to be subdivided require dedication "of such property as is necessary for the orderly development of streets, roadways, [and] thoroughfares." Applications for plats of property as a

single lot and replats also have dedication requirements as necessary for the development of thoroughfares.

On cross-examination, Taylor testified that the Babarias' plat acknowledged the dedication, but she could not say from looking at the plat whether the dedication had been required or was done voluntarily, and she could not remember how the dedication had happened.

The objected-to parts of Taylor's testimony—that Southlake's subdivision ordinance required certain dedications in a plat and that such a dedication was made by the Babarias when they originally platted their property—were statements of fact, not expert opinions. Taylor did not testify about how that ordinance would affect any future plat of the Babarias' property. Taylor did not testify that any future plat of the Babarias' property would require the Babarias to simply give part of their property to Southlake with no compensation. It was not expert opinion testimony to say that the Babarias had dedicated part of their property when they platted their property; it was a statement about an actual event that occurred and that could be refuted.[57]

The Babarias further argue that allowing Taylor to testify that they had previously been required to dedicate a portion of their property when they filed their plat application to construct their home was erroneous because "the testimony only served to 'back door' the prohibited expert testimony regarding

---

[57] *See Fact*, Black's Law Dictionary (9th ed. 2009) (defining "fact" as "[a]n actual or alleged event or circumstance").

28

application of the Ordinance to the property at issue." They argue that "counsel for Southlake used the testimony regarding the Subdivision Ordinance to argue in his closing that its application to a new plat request by [the Babarias] would have required exclusion of certain property from any compensation analysis since it would have had to be simply given to [Southlake]."

There are several flaws with the Babarias' argument. First, Taylor's testimony about a past event was permissible. Taylor's testimony on that point was not an opinion about how the ordinance might hypothetically apply in the future, it was an assertion of fact about something that had already happened. She did not testify that the Babarias would have to dedicate a portion of the condemned property without compensation in order to receive approval for a requested *future* plat.

Second, the jury was read the subdivision ordinance in question, and it was that ordinance that served as the basis of the unobjected-to closing argument, not Taylor's opinion of it. The only part that Taylor's testimony played in the closing arguments was an implication or reference based on the part of the subdivision ordinance she read aloud during her testimony, when Southlake's counsel stated that Ashwin Babaria had to be aware of the effect of the ordinance because he dedicated a portion of his property when he platted it. But that argument reflects Taylor's testimony about what happened in the past, not any testimony by Taylor about what would happen with any future plat. And Hawkins, the Babarias' expert, also testified about the effect of the subdivision

29

ordinance and possible scenarios in which a dedication would not be required. We overrule the Babarias' fourth issue.

*2.5. The trial court did not err by denying the Babarias' motions for JNOV and to disregard findings*

In their fifth issue, the Babarias argue that the trial court erred by denying their motion for JNOV and motion to disregard jury findings and that the trial court "should have rendered judgment based on the only legally competent testimony presented at trial regarding the just compensation due to the Babarias." Alternatively, they argue that this court should reverse and remand for a new trial on the issue of compensation. Their argument under this issue is based on their contention that Stearman's and Taylor's testimony should have been excluded, leaving Hawkins's testimony the only evidence of market value. Having overruled their challenges to Stearman's and Taylor's testimony, we overrule this issue as well.

## 3. Conclusion

Having overruled the Babarias' issues, we affirm the trial court's judgment.


/s/ Lee Ann Dauphinot
LEE ANN DAUPHINOT
JUSTICE

PANEL:  DAUPHINOT, GARDNER, and GABRIEL, JJ.

DELIVERED:  January 14, 2016

30